971 So.2d 803 (2007)
Carl L. MASZTAL, Joseph A. Graupier, Juana Martinez, and Marisol Fernandez, on behalf of themselves and all others similarly situated, Appellants,
v.
The CITY OF MIAMI, Florida, Appellee.
Nos. 3D06-1259, 3D06-920, 3D06-924, 3D06-947, 3D06-1255, 3D06-1055, 3D06-1046.
District Court of Appeal of Florida, Third District.
August 8, 2007.
Rehearing and Rehearing Denied January 8, 2008.
Michael Garcia Petit, Patrick A. Scott, and Richard L. Williams; Adorno & Yoss, *805 Jack R. Reiter, and Natalie J. Carlos, Miami; Rubinstein & Associates, and Jeffrey Rubinstein, Miami; Gilbride, Heller & Brown, Lewis N. Brown, and Dyanne E. Feinberg, Miami, for appellants.
Cole, Scott & Kissane, and Scott A. Cole and Thomas E. Scott, and Krista Fowler, Miami, for appellee.
Before RAMIREZ, CORTIÑAS, and ROTHENBERG, JJ.
Rehearing and Rehearing En Banc Denied January 8, 2008.
RAMIREZ, J.
Carl L. Masztal, et al., appeal a final order granting appellee City of Miami's motion to set aside or vacate a settlement and recover monies paid, and an adverse final judgment and amended final judgment. Because the settlement amount was patently unfair and compromised the claims of the underlying class, we must affirm all the orders under review.
The final order in this consolidated appeal vacated a $7 million settlement entered into in the underlying class action. The plaintiffs, Eva Nagymihaly, Jean Robert Prosper, Jocelyn Prosper, Kenneth Merker, Gordon Willitts, and Algie Didlaukis, alleged that the City did not have the authority to impose a special assessment to fund fire rescue services. They sought to declare the fire rescue assessment, Ordinance Number 11584, unconstitutional and a return of all funds the City collected. They also sought to declare section 170.201, Florida Statutes, unconstitutional, to the extent that it permitted municipalities to levy and collect special assessments to fund municipal services that included fire protection and emergency medical services.
The plaintiffs and Adorno & Yoss appealed the final order under rule 9.130(a)(3)(c)(ii), Florida Rules of Appellate Procedure, as a final order because the trial court disgorged Adorno & Yoss' fee. Plaintiffs Merker and the Prospers also separately appeal the final order.
The City also filed a motion for the entry of judgment, seeking to impose joint and several liability on each of the plaintiffs and Adorno & Yoss for the sum of $3.5 million. The plaintiffs and Adorno & Yoss argued that, because a notice of appeal had been filed as to the final order, rule 9.130(f), Florida Rules of Appellate Procedure, precluded the trial court from entering a final judgment. The trial court subsequently entered final judgment against the plaintiffs for the entire amount of the settlement proceeds apportioned to them. The trial court also declined to find joint and several liability. The City, plaintiffs, and the Intervenors all appeal the final judgment.
The City also filed a motion for clarification or amendment of the final judgment, seeking to recover prejudgment interest. The trial court entered an Amended Final Judgment, reserving jurisdiction to determine prejudgment interest, costs and attorneys' fees. The plaintiffs filed notices of appeal of the Amended Final Judgment as well. All appeals of the final order, final judgment, and amended final judgment were consolidated.

1. Factual Background

a. Retention of Counsel and Underlying Proceedings
In early 1998, a group of citizens joined together to contest the proposed fire rescue assessment. They formed a Florida nonprofit corporation called Tenants and Taxpayers United for Fairness, Inc. Peter Clancy was the President, and nine others made up the original Board of Directors, including Judy Clark and Eva Nagymihaly. The corporation solicited donations from the public to fund their impending litigation. The funds helped defray the *806 cost of hiring the firm of Atlas Pearlman Tropp & Borkson, P.A.[1]
The Atlas Pearlman retainer agreement stated that the case would proceed as a class action. Atlas Pearlman subsequently filed a class action complaint and amended complaint. Clancy created an informational pamphlet to distribute to the public and help secure donations. The pamphlet explained that the "named plaintiffs really represent every other private owner in the City" and why "a class action lawsuit [was] filed." In his testimony, Clark admitted that the purpose of the lawsuit was to end the fire rescue fee and obtain a refund for all who had paid the assessment.
Atlas Pearlman continued representation until the firm merged its practice with the firm of Adorno & Yoss, LLP in 2002. Assistant City Attorney Charles C. Mays represented the City.
Six years elapsed between the inception of the class action suit and settlement during which time extensive litigation and negotiations took place. Both Atlas Pearlman and Adorno & Yoss pursued class certification. The court deferred class certification pending trial or cross-motions for summary judgment on the refund issue.
The original plaintiffs subsequently moved for summary judgment on the invalidity of Ordinance Number 11584 and the unconstitutionality of section 170.201. The trial court held the ordinance invalid to the extent that it authorized the City to impose a special assessment for emergency medical services, and it declared section 170.201 unconstitutional to the extent that it included the phrase emergency medical services. It also struck that portion of the statute.
The original plaintiffs also moved for summary judgment on the City's affirmative defenses. The trial court struck the City's affirmative defense that the plaintiffs paid the assessment voluntarily and without legal compulsion. The court further struck the City's statute of limitations affirmative defense, finding that the plaintiffs' claims were not time-barred. The trial court set the trial of the refund issue for May 26, 2004. At this time, the class had not yet been certified. It is undisputed, and the trial court so found in its March 17, 2006 Order, that everyone treated the case as though the class had been certified.
b. Mediation and Settlement
The parties attempted to mediate two days before the scheduled trial. Although Adorno & Yoss had initially demanded $75 million, they now offered to settle for $35 million, both figures clearly intended for the entire class. Adorno & Yoss also discussed a settlement of the individual claims for $7 million, from which Adorno & Yoss would receive $2 million. The case, however, did not settle at mediation.
The concept of the statute of limitations became the subject during settlement negotiations. The City's representative, Deputy Fire Chief Maurice Kemp, testified that the expiration of the statute of limitations period within which the class could bring additional taxpayer claims against the City was part of the overall agreement at mediation. Mays likewise admitted that the legal strategy with regard to the settlement *807 was that he would recommend a settlement of the individual claims and present the settlement to the Commission at a time during which the expiration of the statute of limitations period would bar the other taxpayers' remaining claims. Both former City Manager Joe Arriola and former City Attorney Alex Vilarello were aware of the statute of limitations issue. Adorno Yoss denied having considered the statute of limitations issue in connection with the settlement.
Settlement negotiations continued after mediation concluded. Arriola countered Adorno & Yoss' $35 million demand with $5 million, but Adorno & Yoss declined the counter-offer as an unacceptable class resolution. Arriola thereafter agreed to settle for $7 million to be paid in two installments, with a stay of all proceedings until the Commission voted to approve the settlement. Adorno & Yoss claimed that it intended to pursue the refund claim on behalf of the class, despite the settlement with the individual plaintiffs.
Adorno & Yoss announced in open court on May 26, 2004, that the parties had settled the case subject to Commission approval. There is nothing on the record to indicate that the trial court was apprised of the settlement. Based on counsel's representations that the settlement resolved all issues that were going to trial that day, the trial court reset the scheduled trial. The City agreed to pay in two equal annual payments. The parties did not resolve the apportionment issue, and accordingly the plaintiffs executed only limited releases. Each plaintiff also executed a Non-Disclosure Agreement.
c. City Commission's Approval
The City learned of the terms of the settlement agreement in a series of internal memoranda. On October 19, 2004, Mays recommended that the City settle the refund portion of the lawsuit with the named plaintiffs. Mays further advised that, because of the passage of the time, no other property owner would be able to maintain a refund action against the City. On November 4, 2004, Mays provided City officials with a proposed Resolution for the following October 28, 2004 Commission meeting. The memorandum indicated that the proposed resolution sought authorization for the settlement of the refund portion of the lawsuit brought by a group of property owners. City officials received another memorandum dated November 16, 2004, in which City Attorney Jorge Fernandez reiterated that the settlement was with the named plaintiffs.
The Commission subsequently passed the resolution and approved the settlement. Each plaintiff signed a limited release, and the City thereafter issued its first installment of $3.5 million pursuant to the settlement agreement.
The original plaintiffs subsequently confirmed that they each received compensation. They also admitted that they had received a significant windfall from the settlement amount, as compared to the refund amount which they would have been entitled to under a class settlement.
d. Intervention of New Plaintiffs
A new group of property owners sought to intervene as prospective class members in January of 2005. These new plaintiffs included appellant Carl L. Masztal, Joseph A. Graupier, Juana Martinez, and Marisol Fernandez.
The new plaintiffs alleged in their motion to intervene that the original plaintiffs could dismiss the action and the class claims because the class had not yet been certified. The trial court granted the motion to intervene.
*808 e. Settlement Set-Aside
Both the new plaintiffs and the City moved to vacate the settlement. The City argued that the settlement should be set aside on the grounds of unilateral mistake and public policy.
At the evidentiary hearing on the City's motion to vacate, the City introduced the testimony of City Commissioners Johnny Winton and Jeffrey Allen. Both Commissioners testified that they believed that the settlement was class-wide. Fernandez likewise testified that he believed that the settlement was for the entire class.
The trial court granted the City's motion to vacate and set aside the agreement on the grounds of unilateral mistake. The trial court found that the City did not know that the settlement was for individual claims, the documents were allegedly conflicting as to the scope of the settlement, and the Commissioners did not exhibit inexcusable lack of due care when they voted to approve the settlement. The trial court further found that there was an implied class action requiring judicial approval of the individual settlement for fairness and reasonableness.
The trial court also granted the Intervenors' motion to vacate on the grounds of breach of fiduciary duty and collusion. The trial court then ordered the plaintiffs and their counsel to disgorge and return the first installment paid of $3.5 million to be placed in an account to be administered by counsel under the court's supervision pending final resolution of the case. The trial court appointed the Intervenors as the class representatives and certified the class.

2. Analysis

We must review the trial court's findings of fact in this bench trial to determine if they are supported by competent, substantial evidence. See Zerquera v. Centennial Homeowners' Ass'n, Inc., 721 So.2d 751, 752 (Fla. 3d DCA 1998). Against the foregoing backdrop, we conclude that competent, substantial evidence supports all of the trial court's findings of fact. The trial court properly vacated the settlement on the grounds that the original plaintiffs and Adorno & Yoss breached their fiduciary duties to the class, and that the City committed a unilateral mistake sufficient to rescind the settlement agreement. We need not address, however, the issue of unilateral mistake or any of the numerous other arguments raised in this appeal, as the parties' breach of fiduciary duty upon which we affirm is alone sufficient to set aside the settlement.
a. Breach of Fiduciary Duty
Adorno & Yoss argues that the trial court erroneously determined that the original plaintiffs and the firm breached their fiduciary duties to the class because no class had been certified at the time of the settlement, and thus the original plaintiffs could settle their individual claims without a fairness hearing or judicial approval.
We recognize that class certification is indeed a prerequisite to the existence of a class action, and that certification is the appropriate point from which a class action starts. Adorno & Yoss correctly points out that there is no class certification in this case. But from the outset of this case, the original plaintiffs and Adorno & Yoss proceeded on behalf of the class. Class certification here was inevitable, and represented nothing more than a ministerial act, the failure of which cannot be used to circumvent or undermine a fiduciary relationship.
As the Florida Supreme Court stated in Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 421 (1927), a fiduciary duty extends:

*809 to every possible case . . . in which there is confidence reposed on one side and the resulting superiority and influence on the other. . . . The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.
(citations omitted). The law implies a fiduciary relationship "based on the circumstances surrounding [a] transaction and the relationship of the parties." Maxwell v. First United Bank, 782 So.2d 931, 933 (Fla. 4th DCA 2001). An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party. Id. at 934. In a taxpayer suit, for example, the plaintiffs owe:
[A]t least a minimal duty of fidelity to the taxpayers, on whose behalf the suit is brought and standing procured. Where . . . a plaintiff in a taxpayer's suit seeks personal recompense in absolute disregard of the interests of the taxpayers as a whole, that duty of fidelity is breached.
Allied Minority Contractors Ass'n, Inc. v. Broward County, 738 So.2d 525, 527 (Fla. 4th DCA 1999). Lawyers owe a similar duty of fidelity to their clients, as well as countless other duties to their clients and the courts far too numerous to merit mention within the scope of this opinion, but of no lesser importance.
In this suit over an invalid assessment, at the very least, there was an implied fiduciary relationship between the original plaintiffs, Adorno & Yoss, and the class. The original plaintiffs voluntarily accepted the position of class representation and proceeded to represent the class through the creation of an organization whose purpose was to oppose the subject fee and secure a refund for all taxpayers who had paid the invalid assessment. Adorno & Yoss likewise undertook representation of the original plaintiffs to further their cause and it received payment from them for that purpose. Indeed, Adorno & Yoss admitted, as the record reflects, that the firm represented the putative class throughout the pendency of this action.
b. Prejudice to the Class
Nor do we agree with Adorno & Yoss that the settlement did not prejudice the class. It defies any bounds of ethical decency to view class counsel's actions as anything but a flagrant breach of fiduciary duty. Both the original plaintiffs and Adorno & Yoss breached their fiduciary duty to the class. The Fourth Circuit stressed in Shelton v. Pargo, Inc., 582 F.2d 1298, 1305 (4th Cir.1978), that class representatives:
[M]ay not abandon the fiduciary role they assumed at will or by agreement with the appellant, if prejudice to the members of the class they claimed to represent would result or if they have improperly used the class action procedure for their personal aggrandizement.
The evidence adduced at trial shows that the original plaintiffs misled the City's taxpayers into donating money for a class action that merely enriched seven individuals, who received a grossly disproportionate settlement amount. The amount the original plaintiffs settled upon bears no relation to the extent of any damages they paid in the form of assessments during prior years. The original plaintiffs admitted that they received a windfall from the settlement. The original plaintiffs, together with Adorno & Yoss, then conspired to keep silent about the settlement terms, to the detriment of the other taxpayers.
Adorno & Yoss' conduct further solidified the compromise of the class claims. The firm oversaw the settlement of $7 *810 million which the parties agree could have otherwise resulted in a refund of $24 million to $70 million for the class. Additionally, Adorno & Yoss failed to move the class refund claims along, allowing the City to raise statute of limitations issues that were not otherwise available prior to the inequitable settlement. The language of the settlement actually called for a standstill of the litigation. Furthermore, at no time did Adorno & Yoss exercise candor before the trial court to explain the nature of the settlement. This reprehensible conduct alone is more than sufficient to establish a breach of fiduciary duty.

3. Conclusion

We thus conclude that the original plaintiffs and Adorno & Yoss breached their fiduciary duty to the class when they agreed to settle and thereby compromised the class claims. The trial court therefore correctly set aside the settlement.
Affirmed.
CORTIÑAS, Judge (concurring).
The facts and applicable law undeniably require affirmance of this case. In fact, based on its dubious merits, this appeal may have warranted a per curiam affirmance ("PCA"). However, such a disposition, without comment on the reprehensible conduct of certain attorneys involved in this case (referred to as "original lawyers"), would have only served to further conceal their actions.
It is undisputed that the original class representatives' claims totaled less than $84,000. Nevertheless, the original lawyers, aided by the complicity of two different City of Miami Attorneys and a City Manager, "settled" $84,000 in claims for $7 million, out of which $2 million would go to Henry N. Adorno's law firm. The City of Miami Commission was persuaded to approve the $7 million scheme, after being advised by the City Attorney that their exposure was $24 million.
The settlement of $84,000 in claims for $7 million was palatable to the settling parties because of their mutual, albeit mistaken, belief that the statute of limitations was fast approaching and its expiration could be used to deprive the vast majority of property owners of a refund. Thus, the $7 million settlement was conditioned on the supposed expiration of the statute of limitations in October 2004, at which time it was believed that the four-year statute of limitations would have precluded the other property owners from obtaining a refund. On May 26, 2004, when advising the trial court of this settlement, Mr. Adorno, as attorney for the entire class, told the trial court, in pertinent part:
"the Plaintiffs and Defendant have agreed to settle subject to City Commission approval. However, the City Commission approval, the earliest it will occur is October [2004]. . . . "
The trial judge was not advised that this was an individual settlement or given the terms of the settlement. Adorno later testified that the settling parties did not discuss the statute of limitations and that the $7 million settlement amount was "pulled out of thin air." However, in order to find Adorno's testimony regarding the statute of limitations credible, one would have to believe that his reference to October 2004 was coincidental, and that, in the real world, $84,000 in claims are settled for $7 million with $2 million going to Adorno's law firm. Even if one were so gullibly inclined, it is difficult to ignore the fact that the settling parties also entered into a non-disclosure agreement, which would keep the facts surrounding their scheme private, despite Adorno's testimony that "the City, under normal terms, entering into a non-disclosure agreement would probably violate . . . the public records *811 law, sunshine law." Apparently, these were not normal circumstances. Not coincidentally, it was not until November 18, 2004, after the supposed expiration of the statute of limitations, that the City Commission was presented with the settlement proposal, which they approved.
In a transparent attempt to legitimize their reprehensible conduct, appellants contend that it is not uncommon for class members of an uncertified class to settle their claims without prejudicing the claims of unnamed class members. They also maintain that they fully intended to pursue the claims of the unnamed class members despite the fact they never did so and, instead, vigorously opposed their intervention in this lawsuit. Moreover, appellants' position is entirely belied by the testimony of Charles Mays, an attorney for the City of Miami, who testified that this settlement was surreptitiously conditioned on the supposed expiration of the statute of limitations and the concomitant extinguishment of the unnamed class members' claims. Plainly and simply, this was a scheme to defraud. It was a case of unchecked avarice coupled with a total absence of shame on the part of the original lawyers. The attorneys manipulated the legal system for their own pecuniary gain and acted against their clients' interests by attempting to deprive them of monies to which they might otherwise be entitled. More unethical and reprehensible behavior by attorneys against their own clients is difficult to imagine.
Under these unique circumstances, the trial court properly set aside the $7 million settlement agreement based on breach of fiduciary duties to the class.
NOTES
[1] The retainer agreement called for the clients to pay Atlas Pearlman $25,000 for attorney's fees and costs to fund the claim, and $35,000 to fund an appeal. It also stated that "after the law firm has been reimbursed for its full hourly fees (not including the retainers and cost payments), the retainer amounts and cost payments will be returned to the individuals or entities that advanced the funds." None of the contributors to the non-profit corporation were reimbursed a penny out of the $7 million settlement.