ROTHENBERG, J.
THE FACTUAL AND PROCEDURAL BACKGROUND
The Real Estate Value Company (“TRIP$”) appeals from a final summary *258 judgment entered in favor of Carnival Corporation (“Carnival”) as to all counts in TRIP$’s second amended complaint. For the reasons that follow, we affirm the judgment in its entirety.
This case centers around a business dispute between TRIP$ and Carnival. In 1995, TRIP$ and Carnival entered into a written contract (the “TRIP$-Carnival Contract”), pursuant to which TRIP$ was authorized to offer patrons individually numbered TRIP$ discount certificates valid on specified Carnival cruises. The TRIP$ discount certificates provided for a savings of $50 per cabin ($25 per guest based on double occupancy) on three and four day cruises, and $100 per cabin ($50 per guest based on double occupancy) on seven day cruises. The TRIP$ discounts could be redeemed during the booking process by presenting the distinct code number located on the TRIP$ certificates. Carnival agreed to track all bookings generated through the TRIP$ discount certificate program, and to pay TRIP$ a specified marketing allowance based on the number of such bookings.
The dispute arose when Carnival subsequently entered into promotional discount agreements with the American Association of Retired Persons (“AARP”) on October 1, 1996, and AARP Services, Inc. (“ASI”), on June 1, 2001 (collectively, “the AARP discount programs”). TRIP$ took the position with Carnival that, pursuant to the TRIP$-Carnival Contract, TRIP$ was contractually entitled to a marketing allowance for bookings generated through the AARP discount programs. Like the TRIP$ discount program, the AARP discount programs provided for discounts of $50 per cabin ($25 per guest based on double occupancy) on three and four day cruises, and $100 per cabin ($50 per guest based on double occupancy) on seven day cruises. Unlike the TRIP$ discount program, however, the AARP discount programs did not provide for the use of TRIP$ discounts certificates — AARP members could redeem their discounts by presenting their AARP membership card or membership number during the booking process — and could only be used for staterooms on levels six through twelve. It is also undisputed that neither the TRIP$Carnival Contract nor any other written agreement between TRIP$ and Carnival specifically addresses the AARP discount programs, and TRIP$ was not a party to, or mentioned in, the 1996 AARP-Carnival agreement or the 2001 ASI-Carnival agreement.
Nevertheless, TRIP$ claims it was ultimately responsible for the procurement of the AARP discount programs. Specifically, TRIP$ alleges that it identified and targeted AARP and ASI as entities with which Carnival could establish lucrative promotional discount programs; acted as a broker in the negotiations of these agreements; and, in fact, negotiated the terms of the AARP discount agreements on behalf of Carnival. On these grounds, TRIP$ claimed entitlement to bookings generated through the AARP discount programs in accordance with the TRIP$Carnival Contract.
It appears that while Carnival disputed that it was contractually obligated under the TRIP$-Carnival Contract to pay TRIP$ a marketing allowance for bookings generated through the AARP discount programs, Carnival was sympathetic toward TRIP$’s request for compensation for such bookings, presumably because of the role TRIP$ allegedly played in procuring the AARP discount programs. Thus, from 1996 through March 2004, Carnival and TRIP$ attempted to negotiate a contractual agreement whereby Carnival would pay TRIP$ a marketing allowance for bookings generated through the AARP *259 discount programs. Although the parties were ultimately unable to finalize such an agreement, Carnival tracked all bookings generated through the AARP discount programs, and paid TRIP$ a marketing allowance for those bookings from 1996 through March 2004.
In early 2004, TRIP$ accused Carnival of underreporting the level of usage being generated through the AARP discount programs, and claimed entitlement to a marketing allowance not only for bookings ultimately made under the AARP discount programs, but for all bookings made by AARP members who inquired about the AARP discount programs, even if they ultimately used a different discount program or rate. TRIP$ claimed such bookings were “generated through” the AARP discount program. Carnival disagreed with that position, and when TRIP$ demanded payment of $35 million in marketing allowances for such bookings, Carnival terminated its business relationship with TRIP$ and ceased to pay TRIP$ for any bookings generated under the AARP discount programs.
TRIP$ filed the instant lawsuit. In its second amended complaint, TRIP$ alleged claims for breach of written contract, breach of oral contract, breach of fiduciary duty, and unjust enrichment. TRIP$ alleged Carnival breached its contractual and fiduciary responsibilities by failing to track all bookings generated through the AARP discount programs, and to pay TRIP$ a marketing allowance for such bookings. In the alternative, TRIP$ pleaded an unjust enrichment claim, arguing that as a result of TRIP$’s efforts with respect to the AARP discount programs, Carnival knowingly received hundreds of thousands of additional bookings, and that it would be inequitable for Carnival to retain the benefits of TRIP$’s work without paying TRIP$ for the value of that work.
In support of TRIP$’s interpretation of the TRIP$-Carnival Contract, TRIP$ sought to present the expert testimony of Roderick McLeod, a former executive in the cruising industry. In his report, Mr. McLeod opined that the TRIP$Carnival Contract was a “lead generation” contract, which required Carnival to track and compensate TRIP$ for all bookings made by AARP members who inquired about the AARP discount programs, even if they ultimately booked a cruise using a different rate or program. The trial court ultimately excluded Mr. McLeod’s testimony for several reasons, including its determination that the TRIP$-Carnival Contract was unambiguous, thus prohibiting consideration of extrinsic evidence to interpret the agreement.
Carnival then filed a motion for summary judgment, which the trial court granted after a hearing. The trial court issued a written order concluding, in pertinent part: the TRIP$-Carnival Contract was unambiguous, and its express terms applied only to the TRIP$ discount certificate program, not to the AARP discount programs; there was no evidence in the record to establish the elements of an oral agreement between Carnival and TRIP$ relating to the AARP discount programs; the TRIP$-Carnival Contract provided for an arms length, rather than a fiduciary, commercial relationship; and TRIP$’s unjust enrichment claim failed as a matter of law. This appeal followed.
ARGUMENTS ON APPEAL
On appeal, TRIP$ advances several arguments, which we address below.
I. Whether the trial court properly entered summary judgment on TRIP$’s breach of written and oral contract claims.
As a preliminary matter, TRIP$ does not challenge the trial court’s ruling that *260 TRIP$ failed to present sufficient evidence to establish the elements for breach of an oral contract. We therefore affirm the trial court’s entry of summary judgment on TRIP$’s breach of oral contract claim without further discussion.
Instead, TRIP$ contends the trial court erred in ruling that the TRIP$-Carnival Contract was unambiguous and did not apply to the AARP discount programs. TRIP$ argues this ruling is contradicted by the documentary record and the course of dealing between TRIP$ and Carnival. We reject TRIP$ argument. Upon review of the TRIP$-Carnival Contract, we agree with the trial court that it is unambiguous and does not contractually obligate Carnival to track bookings generated through the AARP discount programs or to pay TRIP$ a marketing allowance for such bookings.
The interpretation of a contract, including whether the contract or one of its terms is ambiguous, is a matter of law subject to de novo review. Zurich Am. Ins. Co. v. Ainsworth, 18 So.3d 9, 12 (Fla. 3d DCA 2009); Envtl. Servs., Inc. v. Carter, 9 So.3d 1258 (Fla. 5th DCA 2009); Imagine Ins. Co. v. State ex rel. Dep’t of Fin. Servs., 999 So.2d 693, 696 (Fla. 1st DCA 2008). “A contract is ambiguous when its language is reasonably susceptible to more than one interpretation, or is subject to conflicting interests.” Pan Am. W., Ltd. v. Cardinal Commercial Dev., LLC, 50 So.3d 68, 71 (Fla. 3d DCA 2010) (quoting Specialty Rests. Corp. v. City of Miami, 501 So.2d 101, 103 (Fla. 3d DCA 1987)). “There are two types of ambiguities — patent and latent. Patent ambiguities are on the face of the document, while latent ambiguities do not become clear until extrinsic evidence is introduced and requires parties to interpret the language in two or more possible ways.” Prime Homes, Inc. v. Pine Lake, LLC, 84 So.3d 1147 (Fla. 4th DCA 2012) (citations omitted). “[I]n the absence of some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence.” Lee v. Montgomery, 624 So.2d 850, 851 (Fla. 1st DCA 1993); Wheeler v. Wheeler, Erwin & Fountain, P.A., 964 So.2d 745, 749 (Fla. 1st DCA 2007).
The plain language of the TRIP$-Carnival Contract is susceptible only to a single interpretation — that it applies specifically to “TRIP$ Programs” using “TRIP$ certificates,” and not to the AARP discount programs. The TRIP$-Carnival Contract provides, in pertinent part:
TRIP$ agrees, at its option, to provide promotional exposure for Participant in the form of discount offers contained in its local and/or national discount programs including, but not limited to, TRIP$ Program and/or other promotional programs of TRIP$.
[[Image here]]
TRIP$ Travel Reward Incentive Plan (TRIP$) agrees that it will feature Carnival Cruise Lines (CCL) offers in TRIP$ certificates.... Certificates will carry a distinct code number and may be redeemed through the primary authorized travel agent, Carlson Wagon-lit Travel, or any other travel agent.
[[Image here]]
All bookings generated through the program will be tracked by CCL and CCL agrees to pay TRIP$ an Association Marketing Allowance for bookings generated in accordance with the following schedule:
[[Image here]]
The Allowance will be paid based on the percentage indicated above applied against the net revenue for each TRIP$ certificate booking. Net reve *261 nue is defined as the gross cruise amount, less the TRIP$ certificate discount, less the booking travel agent commission.
[[Image here]]
The CCL offer reflects the savings and terms applicable to the 1996 TRIP$ certificates. CCL reserves the right to modify the offer for the 1997 TRIP$ certificates. CCL reserves the right to modify the offer for the 1996 TRIP$ certificates.... CCL must review each specific offer, utilizing the TRIP$ certificates, for promotional exposure and consistency.
[[Image here]]
Terms and Conditions:
Certificate may be redeemed at any Carlson Wagonlit Travel, or any other travel agent, and is valid on selected 3, 4, and 7 day Carnival cruises departing between January 4, 1996, and December 20,1996.
[[Image here]]
Only original TRIP$ certificates will be accepted....
Certificate has no cash value and savings amount is expressed in U.S. dollars.
Certificate must be submitted with deposit payment....
(emphasis added).
The language of the TRIP$-Carnival Contract clarifies that “[t]his agreement governs only the Programs set forth in this Agreement, and shall not affect any other Agreement between the parties.” As shown above, the only program set forth in the TRIP$-Carnival Contract is the TRIP$ certificate program. It is un-
disputed that the AARP discount programs do not incorporate the use of TRIP$ certificates, and the contracts establishing the AARP discount programs do not contain any language classifying them as part of a TRIP$ certificate program or make any mention of TRIP$ whatsoever. It follows that the plain language on the face of the TRIP$-Carnival Contract does not apply to the AARP discount programs.[1]
The trial court’s correct determination that the TRIP$-Carnival Contract is unambiguous rendered futile TRIP$’s resort to extrinsic evidence. Although TRIP$ may have identified AARP and ASI as ideal entities for participation in Carnival’s discount program and then “brokered” and/or “negotiated” the terms of the AARP discount programs on behalf of Carnival, and although Carnival admittedly paid TRIP$ a marketing allowance for bookings generated through the AARP discount programs for eight years, these facts do not call into question whether the language of the TRIP$-Carnival Contract encompasses the AARP discount programs, and thus do not give rise to a latent ambiguity in the TRIP$-Carnival Contract. Thus, we affirm the trial court’s entry of summary judgment on TRIP$’s claim for breach of written contract.
II. Whether the trial court erred in entering summary judgment on TRIP$’s breach of fiduciary duty claim.
TRIP$ contends the trial court erred in entering summary judgment on its claim for breach of fiduciary duty. It is axiomatic that to succeed on a cause of *262 action for breach of fiduciary duty, one must first establish the existence of a fiduciary duty. Crusselle v. Mong, 59 So.3d 1178, 1180 (Fla. 5th DCA 2011). “Where ... there is not an express fiduciary relationship, one may be implied in law based on the ‘specific factual situation surrounding the transaction and the relationship of the parties.’ ” Id. at 1181 (quoting Capital Bank v. MVB, Inc., 644 So.2d 515, 518 (Fla. 3d DCA 1994)). “An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party.” Crusselle, 59 So.3d at 1181 (quoting Masztal v. City of Miami, 971 So.2d 803, 809 (Fla. 3d DCA 2007)) (emphasis added).
In its second amended complaint, TRIP$ did not allege the existence of an express fiduciary relationship. Instead, TRIP$ claimed that an implied fiduciary relationship arose under the TRIP$-Carnival Contract because Carnival maintained exclusive control over the information necessary to track bookings generated under the AARP discount programs, and thus TRIP$ relied entirely on Carnival to track all such bookings. TRIP$ alleged that by not tracking all bookings generated by AARP members who inquired about the AARP discount programs but ultimately used a different discount program or rate, Carnival breached its fiduciary duty. We disagree.
As established above, Carnival was not contractually obligated under the TRIP$Carnival Contract to track bookings generated through the AARP discount programs. Thus, it cannot be said that an implied fiduciary duty arose under the TRIP$-Carnival Contract or that Carnival undertook to protect TRIP$ with respect to the tracking of bookings generated under the AARP discount programs. Having failed to establish the existence of a fiduciary duty, TRIP$’s claim for breach of fiduciary duty fails as a matter of law.
III. Whether the trial court abused its discretion in excluding Mr. McLeod’s testimony.
TRIP$ contends the trial court abused its discretion by striking Mr. McLeod’s expert testimony regarding the interpretation of the TRIP$-Carnival Contract. However, as established above, the meaning of an unambiguous contract is an issue for the trial court to determine as a matter of law, and the trial court correctly concluded the TRIP$-Carnival Contract was unambiguous. Thus, resort to extrinsic evidence was impermissible, and the testimony of TRIP$’s expert could not be considered to contravene the express terms of the contract. Lee, 624 So.2d at 851; see also Iden v. Kasden, 609 So.2d 54, 56 (Fla. 3d DCA 1992) (“The expert’s testimony was based chiefly upon custom of the real estate trade, and while custom or usage may be employed in explanation and qualification of the terms of a contract that would otherwise be ambiguous, it cannot operate to contravene express instructions or to contradict an express contract to the contrary.”).
IV. Whether the trial court erred in entering summary judgment on TRIP$’s claim for unjust enrichment claim.
Lastly, TRIP$ argues that the trial court’s entry of summary judgment on the unjust enrichment claim must be reversed. We disagree.
The trial court set forth three grounds upon which it relied in entering summary judgment on TRIP$’s unjust enrichment claim. Although two of these *263 grounds were erroneous,[2] we agree with the trial court that there was no genuine issue of material fact with respect to any of the elements of unjust enrichment, and Carnival was entitled to judgment as a matter of law.
In its second amended complaint, TRIP$ alleged that: it conferred a benefit upon Carnival in the form of bookings generated through the AARP discount programs; Carnival knowingly accepted this benefit; and it would be unjust for Carnival to retain this benefit without adequately compensating TRIP$ for its value. However, it is well established that “[u]njust enrichment ‘cannot exist where payment has been made for the benefit conferred.’” N.G.L. Travel Assocs. v. Celebrity Cruises, Inc., 764 So.2d 672, 675 (Fla. 3d DCA 2000) (quoting Gene B. Glide Co. v. Sunshine Ready Concrete Co., 651 So.2d 190, 190 (Fla. 4th DCA 1995)); see also Am. Safety Ins. Serv., Inc. v. Griggs, 959 So.2d 322, 331-32 (Fla. 5th DCA 2007) (“When a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails.”). The record reflects, and TRIP$ concedes, that for roughly eight years Carnival paid TRIP$ a sizeable marketing allowance for bookings made under the AARP discount programs. The payments ceased only after the termination of the business relationship. During this eight year period, TRIP$ accepted Carnival’s payments without objection. Because the record reflects that TRIP$ was adequately compensated for any benefit conferred on Carnival, the trial court did not err in granting summary judgment as to TRIP$’s unjust enrichment claim.
Affirmed.

. TRIPS alleges there is an ambiguity with respect to the discrepancy between the singular and plural use of the word "program/s” in the TRIP$-Camival Contract. However, any singular/plural-discrepancy is of no consequence because the only program or programs relevant to, and governed by, the TRIP$-Camival Contract are TRIP$ program/s, and as established above, the AARP discount programs are not TRIP$ programs.

. First, the trial court determined that the existence of the express TRIP$-Carnival Contract precluded TRIPS's claim for unjust enrichment. This was error.
We acknowledge the well settled principle that "the law will not imply a contract where an express contract exists concerning the same subject matter.” Kovtan v. Frederiksen, 449 So.2d 1, 1 (Fla. 2d DCA 1984) (emphasis added). However, as set forth above, the trial court correctly determined that the TRIP$Carnival Contract unambiguously does not encompass the AARP discount programs. Thus, the TRIP$-Carnival Contract does not concern the same subject matter, and its existence did not preclude TRIPS from advancing a claim for unjust enrichment.
Further, contrary to Carnival’s contention, TRIPS’s allegation that the TRIP$-CarnivaI Contract encompasses the AARP discount programs likewise did not preclude TRIPS from proceeding on its unjust enrichment claim. Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment. Hazen v. Cobb, 96 Fla. 151, 117 So. 853, 857-58 (1928). Of course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails. However, that was not the case here.
With respect to the second ground, the trial court determined that TRIPS had an adequate remedy at law in the form of money .damages, and after noting that unjust enrichment is equitable in nature, concluded that TRIPS could not maintain its claim for unjust enrichment. This was error.
The trial court relied on Bowleg v. Bowe, in which this Court held “Bowleg’s second count fails because the theory of unjust enrichment is equitable in nature and is, therefore, not available where there is an adequate legal remedy-here, an action on the presumably valid Final Contract.” Bowleg v. Bowe, 502 So.2d 71, 72 (Fla. 3d DCA 1987) (emphasis added). Unlike in Bowleg, however, the TRIP$-Carnival Contract does not encompass the AARP discount programs. Thus, TRIPS cannot recover under the TRIP$-Carnival Contract, and, consequently, TRIPS has no adequate legal remedy.