PER CURIAM.
Both Henry Nissim Adorno and The Florida Bar petition this Court for review of the referee’s report finding Adorno guilty of ethical breaches and recommending a public reprimand. Adorno takes issue with the findings of guilt, and the Bar takes issue with the leniency of the punishment.[1] We have jurisdiction. See art. V, § 15, Fla. Const.
As the number of lawyers increases to an unprecedented level, the responsibility of ensuring that all lawyers conduct themselves within the ethical bounds required by the Rules Regulating the Florida Bar continues to be a top priority for this Court. This case involves one of the more experienced members of the Bar, Respondent Henry Nissim Adorno, who committed serious violations of the Rules Regulating the Florida Bar in connection with his representation of clients in a class action case against the City of Miami involving a challenge to the legality of an assessment.
Adorno settled the lawsuit for $7 million on behalf of seven class action plaintiffs, even though those plaintiffs had damages collectively of only $84,000, and thereafter abandoned his obligations to the thousands of individuals who would have been part of the class. The settlement of $7 million resulted in a fee to the law firm of $2 million.
In the words of the Third District Court of Appeal, which reviewed the propriety of the trial court’s decision to set aside the *1019 entire settlement after learning of these facts: “It defies any bounds of ethical decency to view class counsel’s actions as anything but a flagrant breach of fiduciary duty.” Masztal v. City of Miami, 971 So.2d 803, 809 (Fla. 3d DCA 2007). The referee who heard this case described the settlement with seven individuals “to the detriment of the underdetermined/putative class — under the facts of this case” as “prejudicial, illogical, and unexplainable.”
We approve the referee’s findings of fact and recommendations of guilt. For the reasons expressed herein, including the seriousness of the misconduct, we disapprove the referee’s recommended sanction of a public reprimand and instead impose a three-year suspension — the most severe sanction short of disbarment.
FACTS
Henry Nissim Adorno was admitted to The Florida Bar in 1973 and at the time of the misconduct in this case was a named partner in the Miami firm of Adorno & Yoss. This disciplinary case arose from an underlying civil case seeking class certification for alleged improper emergency medical assessment fees imposed by the City of Miami on property owners.
The parties to the Bar proceedings did not contest the underlying facts, but disputed whether Adorno’s conduct gave rise to any rule violations. The referee stated that a detailed description of the underlying events is set forth in Masztal, which is the appeal from the trial court’s order setting aside the $7 million settlement. Again, Adorno does not contest the facts in Masztal; he challenges the referee’s findings that his conduct violated the Florida Bar rules.
In Masztal, the Third District examined whether the trial court had properly set aside the underlying settlement after it was discovered that the $7 million settlement was only for the few named plaintiffs and not for the entire class. Because the facts presented in Masztal are an accurate summary of the background, and were relied on by the referee, we refer to that opinion:
In early 1998, a group of citizens joined together to contest the proposed fire rescue assessment. They formed a Florida nonprofit corporation called Tenants and Taxpayers United for Fairness, Inc. Peter Clancy was the President, and nine others made up the original Board of Directors, including Judy Clark and Eva Nagymihaly. The corporation solicited donations from the public to fund their impending litigation. The funds helped defray the cost of hiring the firm of Atlas Pearlman Tropp & Borkson, P.A.
The Atlas Pearlman retainer agreement stated that the case would proceed as a class action. Atlas Pearlman subsequently filed a class action complaint and amended complaint. Clancy created an informational pamphlet to distribute to the public and help secure donations. The pamphlet explained that the “named plaintiffs really represent every other private owner in the City” and why “a class action lawsuit [was] filed.” In his testimony, Clark admitted that the purpose of the lawsuit was to end the fire rescue fee and obtain a refund for all who had paid the assessment.
Atlas Pearlman continued representation until the firm merged its practice with the firm of Adorno & Yoss, LLP in 2002. Assistant City Attorney Charles C. Mays- represented the City.
Six years elapsed between the inception of the class action suit and settlement during which time extensive litigation and negotiations took place. Both Atlas Pearlman and Adorno & Yoss pursued class certification. The court deferred class certification pending trial or *1020 cross-motions for summary judgment on the refund issue.
The original plaintiffs subsequently moved for summary judgment on the invalidity of Ordinance Number 11584 and the unconstitutionality of section 170.201. The trial court held the ordinance invalid to the extent that it authorized the City to impose a special assessment for emergency medical services, and it declared section 170.201 unconstitutional to the extent that it included the phrase emergency medical services. It also struck that portion of the statute.
The original plaintiffs also moved for summary judgment on the City’s affirmative defenses. The trial court struck the City’s affirmative defense that the plaintiffs paid the assessment voluntarily and without legal compulsion. The court further struck the City’s statute of limitations affirmative defense, finding that the plaintiffs’ claims were not time-barred. The trial court set the trial of the refund issue for May 26, 200k.. At this time, the class had not yet been certified. It is undisputed, and the trial court so found in its March 17, 2006 Order, that everyone treated the case as though the class had been certified.
Masztal, 971 So.2d at 805-06 (footnote omitted) (emphasis added).
The sole issue set for trial on May 26, 2004, was the amount of money that would be refunded to the entire class. Although the trial court had not yet certified the class, the judge had repeatedly stated that class certification was certain because it was a “no-brainer” issue. Even an Adorno & Yoss memo prepared for trial stated that “the sole issue to be tried is the amount of the ... refund due to the property owners of Miami” and that class certification was a “no-brainer.” In the memo, Adorno & Yoss asked for “$75,450,269.64, representing a refund of the illegally assessed portion” of the property assessment. Adorno himself admitted the issue of class certification was a “no-brainer.” Before the trial, Adorno met with the named plaintiffs to discuss dollar amounts with them — they determined that an acceptable settlement for the entire class would be $35 million.
The class was an easily identified group because it was composed of people who had paid the City’s property assessment, so it was not difficult to determine the amounts of the refunds that would be owed. Adorno decided to handle the settlement negotiations from this point forward. Following mediation, which was not successful, Adorno refused to speak with the City Attorneys. He wanted to speak only with the City Manager, Joe Arriola, whom Adorno knew. Adorno wanted to talk with the “businessman.” Thus, Adorno sought out Arriola and would only speak with him.
On the evening of May 25, 2004, which was the night before the refund trial, Adorno called Arriola and discussed the City’s liabilities, which Adorno stated were from $20 million to $75 million.[2] Meanwhile, the City had calculated damages for the entire class and determined its liability for refunds to the entire class was $23 million to $24 million. During the course of the phone conversation on the night before trial, Arriola stated that the City could not pay $35 million, but could offer $5 million. Adorno replied, “[Tjhere is no frigging way that Judge Lopez is going to approve $5 million.”[3]
*1021 On the morning of May 26, 2004, just before the refund trial, Adorno met with Arriola at a cafe. The mayor of Miami was present for part of this meeting. Ar-riola asked Adorno, “[I]s there anything we can do to avoid court today?” Adorno then offered to settle the case for $7 million on behalf of the named plaintiffs. The City agreed to this amount. The record indicates that the named plaintiffs would receive $5 million and the firm would receive $2 million. There is no indication regarding how the firm’s fee was determined.
After the meeting, that same day, Ador-no went to court before Judge Lopez and stated, “The Plaintiffs and Defendant have agreed to settle this case subject to City Commission approval.” Adorno did not clarify that “plaintiffs” meant the handful of named plaintiffs, rather than the entire class. Adorno also told the court that the parties intended to “maintain the status quo” with respect to the refund aspect of the case — this vague statement apparently meant that there would be no further discovery or other activities until after a City Commission meeting in October. At no point during the refund hearing on May 26, 2004, did anyone make it clear to the judge that the settlement applied only to the named plaintiffs, rather than the entire class of citizens who had paid the assessment.
After that May 26, 2004, hearing, Ador-no did not pursue litigation on behalf of the entire class. Although Adorno claimed that he did not intend to permanently abandon the remaining class members, the inaction was in accord with what Adorno referred to as the standstill agreement — a letter dated May 26, 2004, that Adorno’s partner, Mitchell Bloomberg, sent Assistant City Attorney Mays, which actually called for a standstill of the litigation.
In addition to the standstill agreement, after the settlement, the firm also had the named plaintiffs sign a nondisclosure agreement. Adorno testified that he knew of the nondisclosure agreement and the plans to have the named plaintiffs sign the agreement and that he agreed with it. The named plaintiffs were to keep the settlement confidential until after the first City Commission meeting held after October 1, 2004. Although Assistant City Attorney Mays had informed the firm that public record laws prohibited the City from entering into nondisclosure agreements, the firm still pursued having the named plaintiffs sign the nondisclosure agreement. The named plaintiffs signed the agreement in June 2004 (about two weeks after Mays told the firm that the City could not enter into nondisclosure agreements). The agreement was never signed by a City or firm representative.
The City Commission did not address the settlement agreement until November 18, 2004. After the November 2004 City Commission meeting, the City issued its first installment payment of $3.5 million pursuant to the settlement agreement, in which the firm received $1 million and the named plaintiffs received the remaining $2.5 million to be apportioned. The named plaintiffs “admitted that they had received a significant windfall from the settlement amount, as compared to the refund amount which they would have been entitled to under a class settlement.” Masztal, 971 So.2d at 807.
In January 2005, additional property owners, who were not among the original named plaintiffs, sought to intervene after learning of the settlement that excluded their interests. The trial court held a hearing on February 3, 2005, to consider the intervenors’ motion. At that hearing, Judge Lopez was informed for the first time that the settlement was not for the entire class. The judge indicated that he thought the settlement had been for the *1022 entire class, not merely the handful of named plaintiffs. The judge stated, “It was a pending class motion. I don’t think you can pick off the plaintiffs at this stage without coming before me.”
As explained by the Third District:
Both the new plaintiffs and the City moved to vacate the settlement. The City argued that the settlement should be set aside on the grounds of unilateral mistake and public policy.
At the evidentiary hearing on the City’s motion to vacate, the City introduced the testimony of City Commissioners Johnny Winton and Jeffrey Allen. Both Commissioners testified that they believed that the settlement was class-wide. [City Attorney] Fernandez likewise testified that he believed that the settlement was for the entire class.
The trial court granted the City’s motion to vacate and set aside the agreement on the grounds of unilateral mistake. The trial court found that the City did not know that the settlement was for individual claims, the documents were allegedly conflicting as to the scope of the settlement, and the Commissioners did not exhibit inexcusable lack of due care when they voted to approve the settlement. The trial court further found that there was an implied class action requiring judicial approval of the individual settlement for fairness and reasonableness.
The trial court also granted the Inter-venors’ motion to vacate on the grounds of breach of fiduciary duty and collusion. The trial court then ordered the plaintiffs and their counsel to disgorge and return the first installment paid of $3.5 million to be placed in an account to be administered by counsel under the court’s supervision pending final resolution of the case. The trial court appointed the Intervenors as the class representatives and certified the class.
Masztal, 971 So.2d at 808.
In the order, the trial court stated that from the inception of the case, the parties had treated it as a class action. Further, the judge noted that he had made it clear, on several occasions, that he would certify the class. In addition, the trial court stated that the
decision by plaintiffs’ counsel to be less than forthright with the court about the type of settlement reached by the parties and the lack of clarification on the part of the defendant supports the finding that the parties were seeking to avoid the Court’s duty to perform a fairness hearing under rule 1.220(e). All settlements, whether individual or class, should have been brought before this Court for a fairness hearing, or should have been held in conjunction with the refund trial.
Final Order on Defendant’s Motion to Set Aside or Vacate the Settlement and Recover Monies Paid Toward Same at 3-4, Masztal v. City of Miami, No. 98-11208 CA01 (Fla. 11th Cir.Ct. Mar. 17, 2006). The trial court’s order stated that the class action was “ultimately disregarded for personal gain” and the “amounts settled for by the individual plaintiffs bear no rational relation to the extent of their damages,” since they “were refunded the full amount paid of the fire fee assessment plus a premium of approximately 800%.” Id. The named plaintiffs appealed to the Third District, which affirmed the trial court. The district court held that (1) the original plaintiffs and their attorneys had an implied fiduciary relationship with the proposed class, and (2) the original plaintiffs and attorneys breached a fiduciary duty to the class when they settled their claims prior to the class being certified. Masztal, 971 So.2d at 809-10.
*1023 In the disciplinary hearing before the referee, in which both Adorno and Mays were respondents, the referee found that Adorno’s role in the events was substantially different from the role of Assistant City Attorney Mays.[4] Adorno was the attorney who announced the settlement in Judge Lopez’s court in May 2004. Adorno led the negotiations at mediation with the City, and he negotiated the settlement with City of Miami officials.
The referee recommended that Adorno be found guilty of violating Rules Regulating the Florida Bar 4-1.7 (conflict of interest) and 4-1.5 (excessive or prohibited fee). The referee found that Adorno took an excessive fee when he settled with individual plaintiffs to the detriment of the putative class. In addition, the referee recommended that Adorno be found guilty of violating Rule Regulating the Florida Bar 4-8.4 (misconduct). The referee concluded that as a matter of law, Adorno breached a fiduciary duty owed to the putative class and prejudiced that class when he settled on behalf of individual plaintiffs to the detriment of the putative class. The referee recommended that Adorno be found not guilty of violating Rule Regulating the Florida Bar 4-3.3 (candor toward the tribunal). The referee stated that he could not say “without hesitation, under a clear and convincing standard of proof that Respondent Adorno violated this rule.”[5]
As the disciplinary sanction, the referee recommended that Adorno receive a public reprimand. The referee awarded costs to the Bar in the amount of $8,901.65. With regard to aggravating factors, the referee found three aggravators: (1) a prior disciplinary offense (a private reprimand for minor misconduct in 2003); (2) multiple offenses (violations of rules 4-1.5, 4-1.7, and 4-8.4); and (3) substantial experience in the practice of law. The referee also found that Adorno caused potential or actual injury to the putative class and left “thousands of potential plaintiffs unable to effectively pursue their claims against the City of Miami,” in addition to “causing unnecessary delay and expense to the parties.”
In mitigation, the referee found five mit-igators: (1) Adorno provided full and free disclosure to the disciplinary board and had a cooperative attitude toward the proceedings; (2) although experienced as an attorney, Adorno was not experienced in handling class actions; (3) Adorno had a good reputation in the legal community and had made substantial contributions to his community and the legal profession; (4) Adorno’s prior disciplinary offense was remote; and (5) Adorno “exemplifie[d] a dedication to pro bono work together with substantial contributions to those less fortunate in the Miami Dade community.”
The Florida Bar petitioned this Court for review of the recommended sanction, seeking more substantial discipline. Ador-no filed a cross-petition for review, challenging the recommendations of guilt.
ANALYSIS
Adorno challenges the referee’s recommendation that he be found guilty of violating the Rules Regulating the Florida *1024 Bar. In this case, the findings of fact are based upon an order of summary judgment. As this Court has held, a referee has the authority to grant summary relief “when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. However, unlike a referee’s factual findings, which are entitled to deference, a referee’s order granting summary relief is reviewed de novo by this Court.” Fla. Bar v. Gold, 937 So.2d 652, 655 (Fla.2006) (citations omitted).
Conflict of Interest — rule 4-1.7. The referee recommended that Respondent be found guilty of violating rule 4-1.7, which prohibits representation where the actions of the attorney constitute a conflict of interest. See R. Regulating Fla. Bar 4-1.7(a)(1) (a lawyer shall not represent a client if the representation of one client will be directly adverse to another client); 4-1.7(a)(2) (a lawyer shall not represent a client if there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer’s responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer). Adorno asserts that he did not create a conflict of interest when he settled the claims for only a handful of plaintiffs for $7 million, even though he failed to advise the members of the class and he abandoned any further pursuit of a class action lawsuit. Adorno’s position is based on the argument that he did not have a duty to the rest of the members of the class because the class had not yet been certified.
The facts and the law directly refute Adorno’s position. This case does not involve a technical conflict of interest. The facts show that Adorno negotiated to the detriment of the other class members when he settled for the named plaintiffs for an amount grossly disproportionate to the value of their individual claims. In doing so, he received a $2 million fee for the firm, while he ignored or abandoned the putative class members. The seven named plaintiffs had a total of $84,000 in claims, yet Adorno’s meeting with City representative Arriola resulted in a settlement of $7 million. In comparison, the City had estimated its exposure for the entire class was approximately $23 or $24 million. The amount the original plaintiffs settled for bears no relation to the extent of any damages they incurred in the form of assessments they paid during prior years. In fact, the $7 million settlement is more than eighty-three times larger than the $84,000 value of the named plaintiffs’ claims.
By abandoning the class for the few named plaintiffs and the substantial fee for his firm, Adorno compromised the class claims. The named plaintiffs were disproportionately enriched, while Adorno’s actions in reaching the “inequitable settlement” left thousands of potential class plaintiffs unable to effectively pursue their claims against the City and placed them in a financially disadvantageous situation— the payment of $7 million substantially reduced the amount that the thousands of other class action members would be able to receive in any settlement. Thus, even if the putative class attempted to negotiate with the City, close to 30% of the City’s identified refund liability ($23 to $24 million) had been given to seven plaintiffs, leaving thousands of class members to seek refunds through settlement from the substantially reduced amount of calculated funds — an amount that had been determined based on the assessments paid by the easily identified pool of citizens. Further, at trial it is likely that the City would have argued that (a) it had settled with the class, and (b) it had a right to a setoff for all amounts paid out.
*1025 In addition, there is another troubling aspect to this case: whether Adorno and his firm, by agreeing to a stay or standstill of the litigation and having their clients sign a nondisclosure agreement so that no other class members would be notified of the settlement, provided the City with ammunition to pursue a statute of limitations defense as to the remainder of the class. As explained by the Third District:
The concept of the statute of limitations became the subject during settlement negotiations. The City’s representative, Deputy Fire Chief Maurice Kemp, testified that the expiration of the statute of limitations period within which the class could bring additional taxpayer claims against the City was part of the overall agreement at mediation. Mays likewise admitted that the legal strategy with regard to the settlement was that he would recommend a settlement of the individual claims and present the settlement to the Commission at a time during which the expiration of the statute of limitations period would bar the other taxpayers’ remaining claims. Both former City Manager Joe Arriola and former City Attorney Alex Vilarello were aware of the statute of limitations issue. Adorno Yoss denied having considered the statute of limitations issue in connection with the settlement.
Masztal, 971 So.2d at 806-07. Whether or not Adorno’s actual intent in entering into the standstill agreement and having his clients sign a nondisclosure agreement was to cut off the claims of the remaining class members, there is no question that the collective import of Adorno’s actions regarding the disproportionate settlement amount, as well as the terms of the settlement, created a conflict of interest that prejudiced the remaining class members.
Before this Court, Adorno asserts that he did not have an attorney-client relationship with the putative class and, thus, he did not have any responsibilities to that class. Adorno’s argument misses the point. As the Third District Court noted in Masztal, the crucial issue is whether Adorno had a fiduciary duty to the putative class, not whether he had an attorney-client relationship with those members. It is the breach of the fiduciary duty that violated rule 4-1.7.
Further, we reject Adorno’s arguments that he had no duty to the class members. Contrary to Adorno’s arguments before this Court, the record demonstrates that the underlying case was viewed as a class action and that Adorno knew he had a fiduciary duty to the class. The claim was filed as a class action, and on the very day the settlement was announced, the refund trial was going to be held to determine the amount of refund to the entire class. The trial court judge had previously stated that certification of the class was a “no-brain-er,” and the record shows that Adorno was fully aware of the judge’s statement. When the trial court subsequently held a hearing to determine whether to set aside the settlement, Adorno testified:
COUNSEL: But you’re well aware from reading the transcripts of the May 4th, 2004, hearing that the judge and Mr. Bloomberg [another attorney at Adorno and Yoss] indicated that certification was a no-brainer?
ADORNO: And you can add me to that group.
COUNSEL: And yourself—
ADORNO: Yeah.
COUNSEL: — to the group, indicating that certification of the class was a no-brainer?
ADORNO: Absolutely.
In addition, as demonstrated by Ador-no’s admissions in the record, he was aware of the putative class and knew he had a duty to it. With regard to a May 24, *1026 2004, meeting with the named plaintiffs before mediation, Adorno testified in his deposition as follows:
COUNSEL: Okay. And in the meeting with the clients, what do you recall being discussed?
ADORNO: I pretty much ran that meeting, explained in general terms why we were there, and they had — it was necessary for us based upon the judge’s requirement of mediation that we have a number to be able to settle. So most of the conversation was my telling them what I thought that number should be. And I needed to get their permission, even though I explained to them that notwithstanding us agreeing to a number, this would have to go back to Judge Lopez for approval, but I wasn’t authorized just to go in there and do it without some acquiescence from the class representatives.
COUNSEL: Right. And the approval by Judge Lopez would be if it were a settlement of the class claims, correct?
ADORNO: That’s — at that time, that was the only conversation that we had.
COUNSEL: Okay. So the numbers you were discussing with your clients had to do with, at that initial meeting, had to do with the numbers that they would approve for settling the class claims?
ADORNO: Yes, sir.
COUNSEL: Okay. And what did the clients give you authority to give a number to Mr. Mays?
ADORNO: 35 million.
(Emphasis added.)
Further, during the course of the underlying proceedings, the judge and the attorneys repeatedly spoke about the class— including how simple it would be to identify the actual members once the issue of the refund was resolved. All that was needed was to examine the City’s list of property owners who had paid the assessment. Thus, for the sake of judicial economy, the judge and parties had decided to address other issues before certifying the class. At a February 17, 2004, hearing before Judge Lopez, at which Adorno was present, the transcript reflects the following discussion regarding the plaintiffs’ motion for class certification:
COURT: We have to address the refund issue first. Because to me, anybody that is a property owner within the operative time frame that was assessed a fee, if it’s found to be refundable, this is a no-brainer, that’s a class certification.
[[Image here]]
COURT: Why don’t I need to address — as I’ve said, the numbers are there. The class certification is not a big issue to me.
MAYS [Assistant City Attorney]: And.....
COURT: Stop.
Certifying the class at this moment doesn’t help anything other than spend more money. If I rule against you on the refund issue, this case is over, right?
CAMPBELL [of Adorno & Yoss]: That is correct, your Honor.
COURT: Why are we wasting time with the certification today when we should be addressing whether or not, as I said, I’ll make a finding, whether that’s affirmed or not is always an issue. Once that is done, this case is ripe for certification, why do we need to address that today?
[[Image here]]
COURT: You’re misreading me. I plan to do it all at one time.

If I find you’re entitled to a refund, and I’ve gone through all those hoops, the issue of class ceHification is a no-brainer. Every homeowner is entitled' 
*1027
to a refund, period, they’ve paid it on their Ad Valorem tax.

[[Image here]]
COURT: Whoever got assessed from the tax rolls, that’s an easy number of persons to determine.
The key questions remains, are they entitled to a refund. That’s not set for today, we’re not here to rule on that. I don’t want to put the cart before the ... horse. I am not going to spend all this time today unnecessarily, even though I think I know what the issues and the numbers are, but why am I going to put you through advertising, sending all the notices, doing all those issues when we may never get to that if I determine that you’re not due a refund?
CAMPBELL [of Adorno & Yoss]: That’s fine, your Honor.
COURT: We’re in agreement with that.
(Emphasis added.) When Adorno testified before the trial court about the interve-nors’ case, he stated that he was representing the entire class at the mediation:
COUNSEL: ... On May 2Uh, the date of the mediation, was the Adorno firm representing itself as the attorneys for the class?
ADORNO: Yes, Sir.
COUNSEL: On May 26th, at the time the settlement was announced to Judge Lopez, was the Adorno firm holding itself out as attorneys for the class, non-certified?
ADORNO: The answer is no and yes. We didn’t announce the settlement to Judge Lopez. The transcript speaks for itself. That wasn’t the purpose of that hearing.

And yes, we were still class counsel.

COUNSEL: On June 8th, when the letter was sent to the manager, was the Adorno firm still representing itself as class counsel?
ADORNO: Yes, Sir.
(Emphasis added.)
As demonstrated above, from the outset, people other than the named plaintiffs were viewed as members of the putative class, and it was treated as a class action. Further, Tenants and Taxpayers United for Fairness, Inc., the corporation created to challenge the assessment, solicited donations from the public to fund their impending litigation. A pamphlet was developed stating why there should be a class action suit. The record indicates that the funds gathered from the public helped defray the cost of hiring legal counsel. The retainer agreement for Atlas Pearlman stated that “after the law firm has been reimbursed for its full hourly fees (not including the retainers and cost payments), the retainer amounts and cost payments will be returned to the individuals or entities that advanced the funds.” Nevertheless, as the Third District noted in Masz-tal, “None of the contributors to the nonprofit corporation were reimbursed a penny out of the $7 million settlement.” Masztal, 971 So.2d at 806 n. 1.
Adorno attempts to overcome this issue by asserting that Masztal created new law regarding fiduciary duty and he should not be sanctioned for violating a duty that did not exist when he engaged in the conduct. Adorno’s argument is disingenuous. This Court has long held that the term “fiduciary relation” is a broad term, embracing both technical fiduciary relations and informal relations. Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 421 (1927). This Court has refrained from defining particular instances of fiduciary relation “in such a manner that other and perhaps new cases might be excluded.” Id. (quoting Beach v. Wilton, 244 Ill. 413, 91 N.E. 492, 495 (1910)). Rather, we have stressed that the “overwhelming weight of authority” established that the principle of fiduciary duty *1028 “extends to every possible ease in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other.” Id. (quoting Beach, 91 N.E. at 495); see also Maxwell v. First United Bank, 782 So.2d 931, 933-34 (Fla. 4th DCA 2001) (“A fiduciary relationship may be either express or implied.... A fiduciary relationship which is implied in law is based on the circumstances surrounding the transaction and the relationship of the parties.”). In Masztal, the Third District relied on these prior decisions, which clearly set forth these principles. Masztal, 971 So.2d at 808-09 (discussing Quinn, 113 So. at 421; Maxwell, 782 So.2d at 933-34; Allied Minority Contractors Ass’n v. Broward Cnty., 738 So.2d 525, 527 (Fla. 4th DCA 1999); Shelton v. Pargo, Inc., 582 F.2d 1298, 1305 (4th Cir.1978)). Under Adorno’s argument, an implied fiduciary duty would extend only to those situations where a Florida court expressly recognized the exact duty previously — a result that is inconsistent with well-established precedent.
Adorno also argues that he should not be found guilty of violating the Bar rules because (1) he relied on the advice of others; (2) the mediator suggested that the parties consider a settlement that did not include the entire class; and (3) the named plaintiffs wanted to settle their $84,000 in claims for a net of almost $5 million. His argument is contrary to the Bar rules and case law. Rule Regulating the Florida Bar 4-5.2(a) plainly states that a “lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person.” Further, in Florida Bar v. St. Louis, 967 So.2d 108, 118 (Fla.2007), the Court held that “advice of counsel” is not a defense available to respondents in Florida Bar discipline cases, unless specifically provided for in a rule or considered as a matter in mitigation. We noted as follows in St. Louis:
[OJther jurisdictions have held that the defense is not available in bar discipline proceedings. In People v. Katz, 58 P.3d 1176, 1187 (Colo.P.D.J.2002), that court said: “It is the individual attorney’s duty and obligation to comply with the Rules of Professional Conduct. The attorney may not delegate that duty or responsibility to another under the umbrella of advice of counsel and thereby create a defense to a violation of those Rules.”
St. Louis, 967 So.2d at 118 n. 3.
In the end, Adorno argues that he is not guilty of misconduct by attempting to shift blame to others, but he is ultimately responsible for his own misconduct. He had the obligation to act to the benefit of the entire class and could not compromise the class action claim to the substantial detriment of the class members and to the substantial benefit of the named plaintiffs. Adorno is the person who brokered the settlement with City Manager Arriola and then abandoned the putative class members.
By focusing on the interests of the named plaintiffs during settlement discussions and abandoning the putative class in order to achieve the $7 million settlement for the named plaintiffs, Adorno violated rule 4-1.7(a)(l) (a lawyer shall not represent a client if the representation of one client will be directly adverse to another client). In addition, because Adorno negotiated the settlement in a manner that resulted in a large fee for his firm and abandoned the putative class, Adorno violated rule 4-1.7(a)(2) (a lawyer shall not represent a client if there is a substantial risk that the representation of one or more clients will be materially limited by a personal interest of the lawyer). See Fla. Bar v. Rodriguez, 959 So.2d 150 (Fla.2007) *1029 (holding that respondent violated rule 4-1.7(a) by entering into a secret engagement agreement with an opposing party and receiving a significant sum from the opposing party, while respondent was still representing his clients against that party).
Accordingly, competent, substantial evidence supports the referee’s recommendation that Adorno violated rule 4-1.7.
Violation of rule 4-8.4. Adorno was also charged with violating rules 4-8.4(a), 4-8.4(c), and 4-8.4(d), and those rules were argued before the referee. The referee recommended finding Adorno guilty of violating rule 4-8.4, but did not identify the specific subdivisions. For the reasons that follow, we find that Adorno has violated each of the charged rules.
First, • by violating rule 4-1.7, as addressed above, Adorno has violated rule 4-8.4(a) (a lawyer shall not violate or attempt to violate the Rules of Professional Conduct). A respondent violates rule 4-8.4(a) whenever he or she violates any other Rule of Professional Conduct.
Next, rule 4-8.4(c) provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The facts indicate that Adorno abandoned the putative class via his settlement negotiations, hid the terms of the settlement agreement from the class through a nondisclosure agreement, and stopped litigating on behalf of the class as a result of the standstill agreement. Although the standstill agreement was allegedly a part of the settlement terms with the City, the nondisclosure agreement was not requested by the City. In fact, the City affirmatively advised the firm that such agreements were prohibited by the City under its public records law.
Although testimony in the record indicates that Adorno’s partner drafted the nondisclosure agreement, Adorno admitted knowing about the plan to have the named plaintiffs sign the nondisclosure agreement and did not oppose that plan. Before the referee, Adorno testified that the City wanted the nondisclosure agreement; however, evidence in the record shows that Assistant' City Attorney Mays refused to sign a letter from the firm that provided the named plaintiffs would sign a nondisclosure agreement. Mays stated that public records laws prohibited the City from entering into such agreements, and no City representative signed the agreement. Nevertheless, about two weeks after Mays told’ the firm that the City would not sign the nondisclosure agreement, the firm still had the named plaintiffs sign the agreement. We conclude that competent, substantial evidence in the record supports finding a violation of rule 4-8.4(c). See also Fla. Bar v. Herman, 8 So.3d 1100, 1106 (Fla.2009) (failure to inform client of the conflict and obtain the client’s consent was dishonest and deceitful in violation of rule 4-8.4(c)).
Finally, the referee found that Adorno breached a fiduciary duty owed to a putative class and prejudiced that class when he settled for the named plaintiffs to the detriment of the putative class. Rule 4-8.4(d) states that a lawyer shall not engage in, conduct in connection with the practice of law that is prejudicial to the administration of justice. Based on competent, substantial evidence in the record, Adorno prejudiced the rights of the putative class by abandoning them, reaching a settlement with the City that only benefited the handful of named plaintiffs, and then failing to move forward with the class action case. The record supports the referee’s recommendation that Adorno violated rule 4-8.4(d).
Violation of rule 4-1.5. The Bar asserts that Adorno’s conduct also violated rule 4-1.5. As to this rule, the referee found that the Bar carried its burden of *1030 proof and that Adorno took an “excessive attorney fee when he settled with individual plaintiffs to the detriment of the putative/undetermined class.” Further, the referee stated as it relates to this rule violation:
Settling with seven individual plaintiffs to the detriment of the undetermined/putative class — under the facts of this case was prejudicial, illogical, and unexplainable.
As a result of Respondent’s prejudice to the class, it follows Respondent took an excessive and indefensible attorney fee.
As the referee found, the fee was obtained by abandoning the putative members of the class action, whom Adorno had a fiduciary duty to represent. The trial court vacated the $7 million settlement due to the breach of fiduciary duty and collusion and ordered Adorno & Yoss to disgorge its fee. Masztal, 971 So.2d at 805, 808. A fee obtained by unethical means is a prohibited fee. See Rodriguez, 959 So.2d at 161— 62 (respondent ordered to disgorge the fee he collected because it was prohibited under the Bar rules); St. Louis, 967 So.2d at 123-24 (same). As such, the fee at issue here was a prohibited fee.
Adorno asserts that the $2 million fee was not excessive because it was less than 30% of the $7 million settlement. In this case, however, it is not the percentage of the settlement that renders the fee a violation of the Bar rules. Rather, it is that the fee was a prohibited fee as it was obtained through unethical means. Moreover, this case was not a contingent fee case. The original retainer agreement with Atlas Pearlman is the only contract between the named plaintiffs and the firm. Because Atlas Pearlman merged with Adorno & Yoss subsequent to the signing of the retainer agreement, Adorno & Yoss was subject to that agreement. The agreement did not mention a contingency fee; rather, it clearly stated that the firm would be paid nonrefundable retainer fees of $20,000 for trial and $30,000 for an appeal, with a $5000 cost payment at both court levels. The retainer agreement states: “In the event that a class action is certified and the litigation is successful, then our law firm will apply to the court for attorneys’ fees. ... The law firm will be entitled to retain all excess fees including fees generated by a multiplier applied by the court.” At the final hearing before the referee, Bloomberg, an attorney at Adorno and Yoss, was asked whether the engagement letter contemplated a contingency fee agreement. He answered, “It does not contemplate an individual settlement, and it does not contemplate a contingency fee.... ” In light of the above, it is unclear how the firm sought $2 million in fees, since the retainer agreement was not a contingency fee agreement.[6]
Accordingly, as competent, substantial evidence in the record demonstrates that Adorno secured the fee by means of unethical conduct (abandoning his obligations to the remainder of the class and settling for a grossly disproportionate amount on behalf of only the named plaintiffs), we conclude that the facts support the referee’s recommendation of guilt for violating rule 4-1.5.
DISCIPLINE
In reviewing a referee’s recommended discipline, this Court’s scope of *1031 review is broader than that afforded to the referee’s findings of fact because, ultimately, it is the Court’s responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. However, generally speaking, this Court will not second-guess the referee’s recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999). Further, when this Court reviews the recommended discipline, it does so mindful of its obligation to impose a sanction that is consistent with the purposes of lawyer discipline.
In Florida Bar v. Pahules, 233 So.2d 130, 132 (Fla.1970), the Court first stated that three precepts should be applied in determining discipline. First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and, at the same time, not depriving the public of the services of a qualified attorney due to undue harshness in imposing a penalty. Id. Second, the judgment must be fair to the respondent — sufficient to sanction a breach of ethics and, at the same time, encourage rehabilitation. Id. Third, the judgment must be severe enough to deter others who might be prone to become involved in like violations. Id. This Court has continued to be mindful of these considerations. See, e.g., Fla. Bar v. Liberman, 43 So.3d 36, 39 (Fla.2010); St. Louis, 967 So.2d at 124; Fla. Bar v. Stein, 916 So.2d 774, 777 (Fla.2005).
Adorno argues that he did not intend to engage in misconduct because he did not know he had a duty to the putative class and did not know he was violating any disciplinary rules by his misconduct and, thus, he should not be subject to a disciplinary sanction. As we have discussed, members of The Florida Bar are responsible for knowing the Rules Regulating the Florida Bar. See R. Regulating Fla. Bar 3-4.1 (every member of The Florida Bar is charged with notice and held to know the standards of ethical and professional conduct prescribed by this Court); see also Fla. Bar v. Dubow, 636 So.2d 1287,1288 (Fla.1994) (recognizing that it is well established that ignorance of the law, especially by lawyers in disciplinary proceedings, is no excuse).
With regard to whether he “knew” he was violating a duty to the putative class, or had intent to violate the rules, the preface to the Florida Standards for Imposing Lawyer Sanctions defines “knowledge” as “the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.” This same standard holds true in case law, which recognizes that a violation of rule 4-8.4(c) requires intent. It is well established that “in order to satisfy the element of intent it must only be shown that the conduct was deliberate or knowing.” Fla. Bar v. Fredericks, 731 So.2d 1249, 1252 (Fla.1999) (stating that the motive behind the respondent’s action was not the determinative factor; rather, the issue was whether the respondent deliberately or knowingly engaged in the activity in question).
Here, the record clearly establishes that Adorno knowingly engaged in the activity in question. When Adorno & Yoss took over the case (after Atlas Pearlman merged with Adorno & Yoss), the case was already viewed as a class action. Adorno’s firm filed an amended complaint that identified the case as a class action. Further, Adorno was present when the trial court referred to class certification as a “no brainer.” Adorno testified before the disciplinary referee and the civil trial court, repeatedly acknowledging that he had a duty to the entire class whom he admitted *1032 ly undertook to represent. In the civil proceeding, he testified as follows:
COUNSEL: Are you aware — you’re not aware, Sir, that a representative party in a class action must adequately protect the interests of those he purports to represent?
ADORNO: No, I would agree with that.
COUNSEL: Okay, would you agree, Sir, that that requirement applies both to the named plaintiffs and to class counsel?
ADORNO: Yes.
COUNSEL: And would you agree, Sir, that because all members of the class are bound by the res-judicata effect of a judgment, a principal factor in determining the appropriateness of a class certification is the forthrightness and vigor with which the representative party can be expected to assert and defend the interest of the members of the class?
ADORNO: I agree with that too.
COUNSEL: And would you agree that, when dealing with class certification, the analysis encompasses two separate inquiries: whether any substantial conflicts of interest exist between the representatives and the class, and whether the representatives will adequately prosecute the action?
You would agree with that?
ADORNO: I think I would agree with that too.
Thus, when Adorno decided to meet with City representative Arriola and negotiate a settlement only for the named plaintiffs (and the resulting fee for his firm), Adorno was fully aware that he had moved away from representing the putative class members. After reaching the settlement agreement, which benefited only the handful of named plaintiffs and his firm, Ador-no and the firm abandoned the putative class members. Adorno then knowingly kept the settlement secret by having the named plaintiffs sign nondisclosure agreements, even though the City had stated that such agreements were prohibited.
Approximately eight months after the settlement was reached for the named plaintiffs, on February 3, 2005, a hearing was held to consider a motion to permit the intervention of new class representatives, an action that was opposed by Ador-no’s firm. When Adorno engaged in these acts of misconduct, the case law was well established that he owed a duty to the putative class.
Although Adorno asserts that he did not have an intent to engage in misconduct, his actions satisfy the element of intent because such acts were deliberate and knowing. Thus, we must review the appropriate Florida Standards for Imposing Lawyer Sanctions that involve knowing misconduct, which are Standards 4.32, 7.1, and 7.2.[7]
Standard 4.32 states: “Suspension is appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.” Adorno did not inform the putative class or the trial court that he had abandoned the class action during the settlement negotiations. On May 26, 2004, when Adorno advised the trial court that the parties had reached a settlement, *1033 Adorno, as attorney for the entire class, did not advise the trial court that he had negotiated a $7 million settlement solely for the handful of named plaintiffs. He failed to inform the trial judge that he had decided not to negotiate on behalf of the entire class. Further, he did not proceed with the refund hearing.
Standard 7.2 states: “Suspension is appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.” Standard 7.1 states that disbarment is appropriate “when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.” The referee specifically found that Adorno caused potential or actual injury when he settled on behalf of the individual plaintiffs for $7 million to the detriment of the putative class. Based on the terms of the settlement agreement that Adorno negotiated, the putative class members could have been harmed significantly, since the payment of $7 million to the named plaintiffs substantially reduced (by approximately 30%) the funds from which the thousands of other class members could be paid in any future settlement with the City and had a potential effect on the amount the class could recover at trial if the City attempted to set off the money already paid. Eventually, members of the putative class took action and intervened on their own. They were able to vacate the settlement and continue the class action, which occurred solely due to the actions of the putative class members and was met with active opposition by Adorno and his firm.
Adorno claims that the firm was going to pursue the class action at a later date. The referee did not make any findings that support Adorno’s claim. Further, as previously discussed, after reaching the settlement agreement, the firm did not pursue any action on behalf of the putative class, and the standstill agreement actually called for a stay of the litigation, which was effective in stopping the case for numerous months. While we do not know if the intent was to allow the City to raise the statute of limitations against the remaining class members at a later date, it is clear that Adorno took no further action on behalf of the class after he negotiated the settlement for the named plaintiffs. There is absolutely no support for Adorno’s claim that his firm was going to pursue a class action at a later date.
Accordingly, for all these reasons, we conclude that Adorno’s actions in breaching the essential obligation to his clients were intentional and not negligent. Thus, a public reprimand is inappropriate. The Standards indicate that either a suspension or disbarment is the appropriate sanction in this ease.
In asserting that this Court should impose a rehabilitative suspension, the Bar points out some of the similarities between the instant case and Florida Bar v. Rodriguez. In that case, the respondent and his firm entered into a secret engagement agreement with the company DuPont, while the firm was actively representing clients against DuPont. Rodriguez, 959 So.2d at 154-55. The firm received $6,445,000 from DuPont in exchange for the engagement agreement. Id. at 155. In the agreement, the firm stated that it would not pursue future actions against DuPont and would be retained by DuPont on an hourly basis for any future DuPont work. The firm did not disclose this agreement or the conflict of interest to clients the firm was representing in settlement negotiations against DuPont. Thus, Rodriguez “became an agent for DuPont *1034 while still representing his Benlate clients against DuPont. In fact, due to the [clients’] funds that were held in escrow to prevent any breach of confidentiality, the firm represented the Benlate plaintiffs as a fiduciary (the escrow agent) for two years after signing the engagement agreement.” Id. at 160. Accordingly, “Rodriguez was representing adverse interests because he was on retainer to DuPont during that two-year period.” Id.
Rodriguez, like Adorno, violated rules 4-1.5 (excessive or prohibited fees), 4-1.7 (conflict of interest), and 4-8.4(a) (violation of the rules of professional conduct). For deliberately engaging in an ongoing conflict of interest that exposed his clients to harm, the Court disapproved the referee’s recommendation of a public reprimand and suspended Rodriguez for two years. Rodriguez, 959 So.2d at 160. The Court noted that Rodriguez’s actions rose above negligence, and applied Standards 4.32 and 7.2, which are the same Standards that apply to Adorno’s knowing misconduct. The Court stated that Rodriguez “was a knowing party to the engagement agreement, he did not disclose the conflict of interest to his clients, and his interests were clearly divided. He protected his interest in the engagement agreement by engaging in actions that were contrary to the interests of his own clients.” Rodriguez, 959 So.2d at 160. Adorno’s misconduct is extremely similar to Rodriguez’s misdeeds. Both attorneys had a definite conflict of interest, acted in their own self-interest, and exposed their clients to harm.
Although the Bar posits that Adorno’s misconduct is less egregious than Rodriguez’s misconduct, we disagree. In fact, Adorno’s behavior could be more aptly compared to that of Rodriguez’s partner in the misconduct,' St. Louis, upon whom we imposed the sanction of disbarment after disapproving the referee’s recommendation of a sixty-day suspension. See St. Louis, 967 So.2d at 122. In explaining the reason for disbarment, we stated:
Disbarment is appropriate “when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.” Fla. Stds. Imposing Law. Sanes. 7.1. At the time St. Louis made the misrepresentations to Judge Wilson and the Bar representatives, he knew his statements were false. Also, he knowingly failed to inform his Benlate clients about the engagement agreement and the conflict of interest. He intentionally engaged in these misrepresentations, violating the duties he owed as a professional, in order to preserve his portion of the $6,445,000 engagement agreement. These acts of deceit were detrimental to the legal system, negatively impacting the proceedings before Judge Wilson and St. Louis’s representation of his Benlate clients.
Id. at 123. In Adorno’s case, except for the fact that the referee did not find clear and convincing evidence of a false representation to the trial court, disbarment would be the appropriate sanction.
Our holding in Florida Bar v. Herman, 8 So.3d 1100 (Fla.2009), also provides guidance in reviewing a case where the attorney engaged in an ongoing and concealed conflict of interest. Respondent Herman failed to inform his client that he was also representing his own company, which was a competitor of his client. Id. at 1103. “Herman represented Aero Controls [the client] at the same time he represented Nation Aviation, his own company. Both companies performed the same services [selling used airplane parts] and functions and had the same pools of potential customers and potential suppliers.” Id. at *1035 1104-05. Based on this misconduct, Herman was found guilty of violating rules 4-1.7 and 4-8.4(c) and received an eighteen-month suspension. Id. at 1105-06. However, we must also consider the consequences of Adorno’s violation, coupled with the fact that additional violations were found in this case.
When considering lawyer discipline, we must impose a discipline that is severe enough to deter other attorneys who might be prone to engage in similar conduct. Prevailing plaintiffs’ attorneys have the potential to earn substantial fees in class-action litigation, but with that potential comes the responsibility to represent the interests of the entire class. With this precept in mind, the opinion in Moody v. Sears Roebuck & Co., 191 N.CApp. 256, 664 S.E.2d 569 (2008), is relevant. With regard to a precertification class-action complaint, the North Carolina court recognized that parties may try to abuse the class-action mechanism in various ways, including:
[Djefendants faced with a class action may be encouraged to try to avoid class resolution of claims by buying off individual named plaintiffs. These defendants could settle with strong class plaintiffs, and proceed with a class action when faced with weak or ineffectual named plaintiffs.... The other side of the coin is that plaintiffs with small claims may try to use class allegations to coerce unusually generous individual settlements from defendants.
Moody, 664 S.E.2d at 578 (quoting 5 Moore’s Federal Practice § 28.64[2][a] (3d. ed. 2008)).
Here, as the referee found, Adorno misused the class-action mechanism to leverage the City into the $7 million settlement for the benefit of a handful of named plaintiffs and his firm. He was proceeding with a class-action, but abandoned the putative class when it was convenient for him to settle the case at a windfall for the named plaintiffs and his firm.
COUNSEL: Sir, you would agree with me, because you were in such an advantageous position with the City on May 26th of 2004 with regard to how this case had been litigated, you were able to get the City to pay $7 million to [seven] people with claims worth about $83,000?
ADORNO: Yeah, I would agree with that.
This is precisely the type of abuse lawyers representing a putative class must avoid. As the referee found, by settling with only the named plaintiffs to the detriment of the putative class, Adorno “left thousands of potential plaintiffs unable to effectively pursue their claims against the City of Miami. Further, the settlement ultimately was appealed, set aside and the litigation renewed causing unnecessary delay and expense to the parties.” Moreover, as the referee stated:
[I]t is the totality of the circumstances one must examine in determining Respondent Adorno’s conduct. Settling with seven individual plaintiffs to the detriment of the undetermined/putative class — under the facts of this case was prejudicial, illogical, and unexplainable.
As a result of Respondent’s prejudice to the class, it follows Respondent took an excessive and indefensible attorney fee.
We recognize that Adorno has developed a reputation in the community for outstanding service. Testifying on Ador-no’s behalf were numerous civic leaders and managing partners of leading law firms, as well as one of our former colleagues who previously practiced law with Adorno. The referee found that Adorno’s life work exemplified a “dedication to pro bono work together with substantial contributions to those less fortunate” and *1036 that he “should be commended and recognized for his substantial life time dedication to pro bono work, charities, and the betterment of his community.” However, this Court has clearly stated that “[p]rior commendable acts cannot exonerate an attorney from the discipline that must be imposed for intentional, egregious ethics violations.” Fla. Bar v. Korones, 752 So.2d 586, 591 (Fla.2000).
[N]either praise of past glory and good deeds, nor mere disappointment with the frailties of humanity can substitute for our duty to properly protect the citizens of Florida. There is certainly a lesson for all lawyers to learn from these most unfortunate of circumstances: Always honor and never betray the oath that grants one the privilege to be a Florida lawyer, no matter how much or how little money may entice.
Id. at 592; see also Fla. Bar v. Travis, 765 So.2d 689, 691 (Fla.2000) (holding that respondent’s prior good works do not overcome intentional misconduct); Fla. Bar v. Aaron, 606 So.2d 623, 624 (Fla.1992). An attorney cannot perform good works in order for such good deeds to be used as a credit against severe misconduct. Travis, 765 So.2d at 691.
We also recognize that the misconduct represented here was nothing short of an egregious violation of Adorno’s professional obligations as an attorney. Although the referee found that Adorno had substantial experience in the practice of law, he also found that Adorno was not experienced in class action lawsuits. Nevertheless, we do not regard what occurred here as a technical violation borne out of inexperience in the practice of class-action certification.
Adorno knew he represented the entire class and that he had an obligation to the entire class. He knew that an acceptable settlement for the entire class would have been $85 million and that the claims of the named plaintiffs were worth only $84,000. He knew that as of the evening before the refund hearing, the City Manager told him that the City would not pay $35 million but could offer $5 million to settle the class action. Adorno replied, “[T]here is no frigging way that [the trial judge] is going to approve $5 million” to settle the class action. Yet, the next morning, Adorno offered to settle for $7 million for only the seven named plaintiffs, which the City accepted even though the day before the City had offered $5 million to settle the entire class action. Although Adorno claimed that the settlement was only for the named plaintiffs, it defies logic that the City would have agreed to pay eighty-three times the amount of the individual claims unless it was to gain an advantage in reducing or eliminating its liability for the class action (such as avoiding any further payments to the remainder of the class). The only logical reason for the nondisclosure agreement, which the City did not seek, would be to keep the fact of the settlement secret from the other putative class members. Further, it is undis-putable that after consummating the settlement and claiming a $2 million fee, Adorno ceased any activity on behalf of the putative members of the class, even though he and the firm were scheduled for a hearing on .the amount of the refund on the day of the settlement. We regard the ethical breaches to the entire class, which inured to the benefit of a handful of plaintiffs, prejudiced the remaining members of the class, and resulted in a $2 million fee for the firm, to be knowing and intentional violations of the Bar rules.
Under all the circumstances, we find that the referee’s recommendation of a public reprimand is unsupported. After considering the factual findings, the totality of the misconduct, the rules violated, the Standards, and case law, we conclude *1037 that a three-year suspension is the appropriate sanction.
CONCLUSION
In conclusion, we approve the referee’s findings of fact, recommendations of guilt, and award of costs. We disapprove the referee’s recommendation of a public reprimand. Henry Nissim Adorno is hereby suspended from the practice of law for three years, effective, nunc pro tunc, October 28, 2010. As Respondent is currently suspended, it is unnecessary to provide him with thirty days to close out his practice to protect the interests of existing clients. Henry Nissim Adorno shall fully comply with Rule Regulating the Florida Bar 3-5.1(g).
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Henry Nissim Adorno in the amount of $8,901.65, for which sum let execution issue.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. After reviewing the record and the briefs of the parties, the Court unanimously concluded that an immediate suspension of Adorno was required due to the seriousness of the misconduct and allowed supplemental briefing on whether more severe sanctions should be imposed, including disbarment. See Fla. Bar v. Adorno, 48 So.3d 837 (Fla.2010).

. The record indicates that Adorno had previously worked with a firm employee in developing a damages model that established an amount for the class settlement, which included all class members. The Adorno & Yoss model estimated a refund amount from $23 million to over $70 million.

. Judge Peter Lopez was the judge presiding in the class action case.

. Charles Mays represented the City of Miami in the underlying civil litigation. His conduct was the subject of Florida Bar v. Mays, No. SC09-1011 (Fla. Apr.21, 2011). The referee submitted a report finding that Mays did not engage in any misconduct and, therefore, did not recommend imposing a sanction on Mays. The Bar did not seek review of that referee’s report, and we have approved the uncontested report. Fla. Bar v. Mays, No. SC09-1011 (Fla. Apr. 21, 2011) (unpublished order).

. This allegation was based on Adorno telling the trial court that the plaintiffs had reached a settlement agreement with the City, but failing to clarify that "plaintiffs” meant only the few named plaintiffs — not the whole class.

. In addition, the amounts of attorneys’ fees in class actions are also circumscribed by case law. See, e.g., Kuhnlein v. Dep't of Revenue, 662 So.2d 309 (Fla. 1995) (holding that in class actions that result in the creation of a common fund, the interest of class counsel in obtaining fees is adverse to interests of the class so the court must determine reasonable attorney fees by applying the lodestar approach).

. In recommending a public reprimand, the referee applied Standards 4.33 and 7.3, which are for negligent conduct. See Standard 4.33 (stating that a public reprimand is appropriate when a lawyer is negligent in determining whether representation of a client may adversely affect another client and causes injury or potential injury); Standard 7.3 (stating that a public reprimand is appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury).